1  ¨Evan J. Smith (SBN242352)
   BRODSKY & SMITH, LLC
2  9595 Wilshire Boulevard, Suite 900
   Beverly Hills, CA 90212
3  Telephone:    (877) 534-2590
   Facsimile:     (310) 247-0160
4  esmith@brodskysmith.com

5  *Attorneys for Plaintiff*
   _____
6

7
                    UNITED STATES DISTRICT COURT
8
                NORTHERN DISTRICCHRT OF CALIFORNIA
9

10 CHRISTOPHER TRAVIS, on behalf of      | **Case No.:**
   himself and all others similarly situated, |
11                                        |
                                          |
12                    Plaintiffs,         | **CLASS ACTION**
                                          |
13      vs.                               | **CLASS ACTION COMPLAINT FOR:**
                                          | **(1)  Violation of  §  14(e)  of the  Securities**
14 GIGPEAK, INC., AVI KATZ, NEIL J.       | **Exchange Act of 1934**
   MIOTTO, KIMBERLY D.C. TRAPP,          | **(2)  Violation  of  §  20(a)  of  the  Securities**
15 JOSEPH LAZZARA, JOHN MIKULSKY,        | **Exchange Act of 1934**
   and FRANK W. SCHNEIDER,               |
16                                        |
                      Defendants.         |
17                                        |
                                          |
18                                        | **DEMAND FOR JURY TRIAL**
19                                        |

20      Plaintiff Christopher Travis ("Plaintiff"), by his attorneys, on behalf of himself and those

21 similarly situated, files this action against the defendants, and alleges upon information and belief,

22 except for those allegations that pertain to him, which are alleged upon personal knowledge, as

23 follows:

24                         **SUMMARY OF THE ACTION**

25      1.    Plaintiff brings this stockholder class action on behalf of himself and all other

26 public stockholders of GigPeak, Inc. ("GigPeak" or the "Company"), against GigPeak, and the

27 Company's Board of Directors (the "Board" or the "Individual Defendants, and collectively with

28 GigPeak, the "Defendants"), for violations of Sections 14(e) and 20(a) of the Securities and

Exchange Act of 1934 (the "Exchange Act"), and to enjoin a cash tender offer (the "Offer") in which Integrated Device Technology, Inc. ("Parent") and its wholly owned subsidiary, Glider Merger Sub, Inc. ("Merger Sub," and together with Parent, "IDT") will acquire each outstanding share of GigPeak common stock for $3.08 per share in cash, an aggregate consideration of $250,000,000 (the "Proposed Acquisition").  Under the Merger Agreement, IDT was obligated to commence the Offer within 15 business days after the date of the Merger Agreement.  The Offer was commenced on March 7, 2017 and is scheduled to expire at midnight on April 3, 2017, subject to extension in accordance with the terms of the Merger Agreement.

2.      The terms of the Proposed Acquisition were memorialized in a February 13, 2017 filing with the Securities and Exchange Commission ("SEC") on Form 8-K attaching the definitive Agreement and Plan of Merger (the "Merger Agreement").

3.      The consummation of the Offer will be conditioned on, among other things, (i) at least a majority of the outstanding shares of the Company common stock plus all shares of the Company common stock issuable to holders of Company options from whom the Company has received notices of exercise shall have been validly tendered in accordance with the terms of the Offer and not properly withdrawn, (ii) the expiration or termination of applicable waiting periods under antitrust laws in the United States, (iii) the absence of injunctions or other restraints prohibiting the transactions, (iv) the accuracy of representations and warranties made by the Company in the Merger Agreement, (v) compliance by the Company with its covenants in the Merger Agreement and (vi) the absence of a material adverse effect on the Company.

4.      In connection with the Merger Agreement, all members of the Board of Directors of the Company entered into a Tender and Support Agreement (the "Tender and Support Agreement") with Purchaser pursuant to which the members of the Board of Directors have agreed to tender their shares of Company common stock in the Offer and to support the Merger and the other transactions contemplated by the Merger Agreement.

5.      The Proposed Acquisition undervalues GigPeak and is the result of a flawed sales process.  As recently as February 2016, the stock was trading above the proposed consideration

CLASS ACTION COMPLAINT

here, and as high as $3.26.  Additionally, all analyst coverage indicates targets above the deal price, ranging between $3.08 and $4.00 per share.

6.      The process leading up to the Proposed Acquisition was also been tainted by the self-interest of certain of the Individual Defendants.  Defendant Avi Katz is scheduled to receive more than $31 million dollars as a result of the deal.  Significantly, the 14D-9 (defined below) does not adequately address when management began discussions with IDT regarding post-close employment.

7.      Moreover, pursuant to the terms of the Merger Agreement, all outstanding and unvested options to purchase GigPeak shares and all restricted stock units, will automatically vest and/or be cancelled in exchange for the Merger Consideration upon consummation of the Proposed Acquisition.  Accordingly, other company insiders including Directors and Officers stand to receive large paydays upon the consummation of the Proposed Acquisition, tainting their motivations in approving it.

8.      Finally, in violation of sections 14(e) and 20(a) of the Securities and Exchange Act of 1934 (the "Exchange Act"), the Defendants caused to be filed a materially deficient 14D-9 Solicitation/Recommendation Statement (the "14D-9") with the U.S. Securities and Exchange Commission ("SEC") in an effort to solicit stockholders to tender their GigPeak shares in the Tender Offer.  The 14D-9 is materially deficient and deprives GigPeak stockholders of the information they need to make an intelligent, informed and rational decision of whether to tender their shares in the Tender Offer.  As detailed below, the 14D-9 omits and/or misrepresents material information concerning, among other things: (a) the sales process of the Company; and (b) the data and inputs underlying the financial valuation analyses that purport to support the fairness opinions provided by the Company's financial advisors, Cowen and Company, LLC ("Cowen") and Needham & Company, LLC ("Needham").

9.      Absent judicial intervention, the merger will be consummated, resulting in irreparable injury to Plaintiff and the Class.  This action seeks to enjoin the Proposed Acquisition or, in the event the Proposed Acquisition is consummated, to recover damages resulting from violation of the federal securities laws by the Individual Defendants.

## PARTIES

10.     Plaintiff is an individual and a citizen of the State of Florida.  The Plaintiff is, and at all times relevant hereto, has been a GigPeak stockholder.

11.     Defendant GigPeak provides semiconductor ICs and software solutions for high-speed connectivity and video compression over the network and the cloud. The company designs, develops, and supplies analog, digital, and mixed signal components to enable high speed information streaming over the telecom networks, datacom infrastructure, and consumer electronics links. It offers a portfolio of modulator drivers and transimpedance amplifiers, and driver solutions to interface with the Lithium Niobate and Indium Phosphide optical modulators; optical, analog, and mixed signal solutions for high-speed data transmission products; wireless RF and MMIC products, including integrated broadband transceivers, transmitters, receivers, amplifiers, power detectors, and delay elements for microwave, millimeter- wave, and GNSS applications; and structured ASIC products to low geometry high end standard cells. The company's industrial product line provides various digital and mixed-signal application specific integrated circuit solutions for industrial applications used in the military, avionics, medical, and communications markets. It markets and sells its products in Asia, North America, Europe, and internationally through direct sales force, distributors, and sales representatives.  The Company is incorporated in the state of Delaware and has a principal place of business located at 130 Baytech Drive, San Jose, California.  GigPeak common stock is publicly traded on the NYSE under the ticker symbol "GIG."

12.     Defendant Dr. Avi Katz ("Katz") is the founder of the Company and has served at all relevant times as Chair of the Board, CEO and President of the Company as well as all of its subsidiaries.

13.     Defendant Neil J. Miotto ("Miotto") has been a member of the GigPeak Board of Directors at all relevant times.  He is deemed by the Company to be a financial expert under SEC and NYSE rules.

CLASS ACTION COMPLAINT

14.    Defendant Kimberly D.C. Trapp ("Trapp") has been a member of the GigPeak Board of Directors at all relevant times.   In addition, Lowe serves as the interim CFO of the Company.

15.    Defendant Joseph J. Lazzara ("Lazzara") has been a member of the GigPeak Board of Directors at all relevant times.

16.    Defendant John Mikulsky ("Mikulsky") has been a member of the GigPeak Board of Directors at all relevant times.

17.    Defendant Frank W. Schneider ("Schneider") has been a member of the GigPeak Board of Directors at all relevant times.

18.    Defendants Katz, Miotto, Trapp, Lazzara, Mikulsky and Schneider identified in ¶¶ 12-17 are collectively referred to as the "Individual Defendants."

19.    Non-Party Integrated Device Technology, Inc., a Delaware corporation, designs, develops, manufactures, and markets a range of semiconductor solutions for the communications, computing, consumer, automotive, and industrial end-markets worldwide. It operates in two segments, Communications; and Computing, Consumer, and Industrial.  It is headquartered 6024 Silver Creek Valley Road, San Jose, CA 95138.  Its common stock is publicly traded on the NASDAQ under the symbol "IDTI."

20.    Non-Party Merger Sub is a Delaware corporation created for the sole purpose of effectuating the Proposed Acquisition.

## JURISDICTION AND VENUE

21.    This Court has subject matter jurisdiction pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331 (federal question jurisdiction) as Plaintiff alleges violations of Sections 14(e) and Section 20(a) of the Exchange Act.  This action is not a collusive one to confer jurisdiction on a court of the United States, which it would not otherwise have.

22.    Personal jurisdiction exists over each defendant either because the defendant conducts business in or maintains operations in this District, or is an individual who is either present in this District for jurisdictional purposes or has sufficient minimum contacts with this

District as to render the exercise of jurisdiction over defendant by this Court permissible under traditional notions of fair play and substantial justice.

23. Venue is proper in this District pursuant to 28 U.S.C. § 1391, because GigPeak's principal place of business is located in the Northern District of California, and each of the Individual Defendants, as Company officers or directors, has extensive contacts within this District.

## CLASS ACTION ALLEGATIONS

24. Plaintiff brings this action pursuant to Federal Rule of Civil Procedure 23, individually and on behalf of the stockholders of GigPeak common stock who are being and will be harmed by defendants' actions described herein (the "Class"). The Class specifically excludes defendants herein, and any person, firm, trust, corporation or other entity related to, or affiliated with, any of the Defendants.

25. This action is properly maintainable as a class action because:

   a. The Class is so numerous that joinder of all members is impracticable. According to the Merger Agreement, as of March 1, 2017, there were more than 67 million common shares of GigPeak outstanding. The actual number of public stockholders of GigPeak will be ascertained through discovery;

   b. There are questions of law and fact which are common to the Class, including *inter alia*, the following:

      i.  Whether Defendants have violated the federal securities laws;

      ii. Whether Defendants made material misrepresentations and/or omitted material facts in the 14D-9; and

      iii. Whether Plaintiff and the other members of the Class have and will continue to suffer irreparable injury if the Tender Offer is consummated.

   c. Plaintiff is an adequate representative of the Class, has retained competent counsel experienced in litigation of this nature and will fairly and adequately protect the interests of the Class;

d.   Plaintiff's claims are typical of the claims of the other members of the Class and Plaintiff does not have any interests adverse to the Class;

e.   The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudications with respect to individual members of the Class which would establish incompatible standards of conduct for the party opposing the Class;

f.   Plaintiff anticipates that there will be no difficulty in the management of this litigation and, thus, a class action is superior to other available methods for the fair and efficient adjudication of this controversy; and

g.   Defendants have acted on grounds generally applicable to the Class with respect to the matters complained of herein, thereby making appropriate the relief sought herein with respect to the Class as a whole.

### SUBSTANTIVE ALLEGATIONS

*Company Background*

26.    GigPeak provides semiconductor ICs and software solutions for high-speed connectivity and video compression over the network and the cloud. The company designs, develops, and supplies analog, digital, and mixed signal components to enable high speed information streaming over the telecom networks, datacom infrastructure, and consumer electronics links. It offers a portfolio of modulator drivers and transimpedance amplifiers, and driver solutions to interface with the Lithium Niobate and Indium Phosphide optical modulators; optical, analog, and mixed signal solutions for high-speed data transmission products; wireless RF and MMIC products, including integrated broadband transceivers, transmitters, receivers, amplifiers, power detectors, and delay elements for microwave, millimeter- wave, and GNSS applications; and structured ASIC products to low geometry high end standard cells. The company's industrial product line provides various digital and mixed-signal application specific integrated circuit solutions for industrial applications used in the military, avionics, medical, and communications markets. It markets and sells its products in Asia, North America, Europe, and

CLASS ACTION COMPLAINT

1 internationally through direct sales force, distributors, and sales representatives.  The Company is

2 incorporated in the state of Delaware and has a principal place of business located at 130 Baytech

3 Drive, San Jose, California.  GigPeak common stock is publicly traded on the NYSE under the

4 ticker symbol "GIG."

5     27.    As acknowledged by the Company, IDT and the analysts that cover the Company,

6 GigPeak's financial performance has been hitting record levels.

7     28.    For example, on October 17, 2016, the Company reported record revenue and

8 enhanced overall financial performance in 3Q16.  Highlights included total revenue in Q3 FY16

9 was a record $15.8 million, compared with revenue of $15.4 million in Q2 FY16, and $10.4 million

10 in Q3 FY15.  Defendant Katz stated, "We proudly delivered another quarter of record revenue and

11 enhanced profitability, proving again the strategy we have in place to drive greater scale in our

12 business and increasing profits by focusing our business on cloud connectivity through networking

13 and broadcasting applications, is succeeding."  He further stated, "We see no letup in demand and

14 believe Q4 FY16 will be another quarter of record revenue."

15     29.    In fact, Defendant Katz was correct.  For 4Q16 and Fiscal 2016, the results show a

16 financial performance indicative of a company on the rise with massive growth potential.  Notably,

17 on the same day as the announcement of the merger, the Company reported "Record Financial

18 Performance for the Fourth Quarter and Fiscal Year 2016."  Highlights include:

19     a.    FY16 record revenue of $58.7 million, an increase of 45 percent above the

20 $40.4 million in FY15;

21     b.    FY16 record GAAP net income of $2.2 million, or net income of $0.04 per

22 diluted share, up from net income of $1.2 million, or $0.03 per diluted share in

23 FY15;

24     c.    FY16 record non-GAAP net income of $12.1 million, or net income of $0.20

25 per diluted share, up from net income $7.3 million, or $0.19 per diluted share

26 in FY15.  The earnings per diluted share results for FY16 and FY15 are based

27 on an average diluted share count of 61.4 million and 38.1 million shares,

28 respectively;

CLASS ACTION COMPLAINT

d. FY16 record Adjusted EBITDA of $16.5 million, up from $10.1 million in FY15; and

e. Q4 FY16 record revenue of $16.2 million, up 3 percent from $15.8 million in Q3 FY16, and up 46 percent from $11.1 million in Q4 FY15.

30. In response to such impressive numbers, Defendant Katz stated, "Fiscal 2016 was a transformative year for GigPeak and culminated in the best quarterly and annual financial performance in the Company's history." "We significantly expanded the product portfolio during the year with the strategic acquisition of Magnum Semiconductor. This addition greatly expanded the addressable markets we serve, namely cloud connectivity, which include the network and broadcast segments, and further diversified our revenue stream. In addition, it increased our customer base and drove additional cross-selling opportunities to existing customers. In FY 2016 we also released a large number of new devices to support next generation data center communication links, as well as advanced optical ASICs."

31. Defendant Katz went on to say that the Company was confident that after being bought by IDT, "we will be able to generate greater value for our customers, employees and stakeholders." Unfortunately, Plaintiff and all other stockholders of the Company will not be able to take part in this further growth and profits, as they are being forced to sell their interest in the Company for an inadequate price.

32. Despite this upward trajectory and glowing pronouncements by management, success, the Individual Defendants have caused GigPeak to enter into the Proposed Acquisition with IDT, thereby depriving Plaintiff and other public stockholders of the Company the opportunity to reap the benefits of GigPeak's present and future success.

***The Flawed Sales Process***

33. The process deployed by the Individual Defendants was flawed and inadequate, and conducted out of the self-interest of the Individual Defendants

34. In July of 2015, a larger competitor of GigPeak ("Company A") reached out to GigPeak to gauge willingness to enter into discussions regarding a possible acquisition of GigPeak by Company A.

CLASS ACTION COMPLAINT

35.    From July of 2015 through January of 2016 GigPeak and Company A had numerous discussions regarding a potential strategic transaction between the two companies.

36.    On January 11, 2016, Company A sent a draft of a letter of intent to GigPeak to acquire the Company for a total purchase price of approximately $3.07 per share.  This letter was thereafter discussed by the GigPeak Board, who determined not to accept the offer, but indicated to Company A that they were open to accepting a higher offer.

37.    Interest from Company A continued through July 2016, at which point, on July 11, 2016, Company A indicated to GigPeak that it was considering offering to purchase the Company for approximately $2.50 per share (which was approximately the same value as the January 11, 2016, offer taking into account a dilution of GigPeak that had occurred in the interim).

38.    On July 27, 2016, the GigPeak Board met to discuss the July 11, 2016, Company A offer and discussed engaging both Cowen and Needham as potential financial advisors to aid in determining the level of third party interest that could exist for a strategic transaction with GigPeak.

39.    From July 2016 through February 13, 2017, GigPeak management, directly and indirectly through Cowen and/or Needham, was in contact with forty-one parties, in addition to Company A, regarding  potential transaction with GigPeak.  Included in these forty-one parties was IDT.  Additionally, GigPeak had management meetings with fifteen parties for acquisition discussions, and received proposals for acquisition from four parties, including IDT in addition to the January 11, 2016, proposal from Company A.  Additionally, during this time both Cowen and Needham were officially engaged by the Company.

40.    On September 23, 2016, Company A informed GigPeak that it would not be continuing discussions regarding a potential acquisition.

41.    On October 4, 2016, a United States based publicly traded company ("Company B"), sent GigPeak a draft of a non-binding letter of intent to acquire GigPeak at a price of $2.78 per share in cash.  On October 21, 2016, after deliberations and communications between GigPeak and Company B, which included numerous counter-offers, Company B informed GigPeak that it had decided to table discussions regarding a potential acquisition of GigPeak until some unspecified later date.

CLASS ACTION COMPLAINT

42.     On October 23, 2016, a Chinese private equity fund ("Investor Y"), informed GigPeak that it was considering making an offer to acquire the Company in cash at a price range of between $2.85 and $3.25 per share, with a likely price per share of $3.12.  The Company negotiated with Investor Y throughout November 2016.  On December 6, 2016, Investor Y told GigPeak management that it would not offer to acquire the Company at a price higher than $2.90 per share.

43.     On November 17, 2016, the Company established a "Special Acquisition Committee" for the purpose of considering and negotiating any letters of intent and potential definitive acquisition agreements.

44.     On December 1, 2016, a publicly traded Chinese corporation ("Company C") sent GigPeak a draft of a non-binding letter of intent to acquire the Company at a price of $3.05 per share in cash.  The potential Company C deal would also involve a Chinese private equity fund ("Investor Z").

45.     On December 7, 2016, Company B sent a revised non-binding letter of interest to acquire GigPeak to the Company Board, valuing the Company at $2.85 per share in cash.  This offer provided for 28 days of exclusivity if executed, and a possibility to extend such exclusivity for an additional 21 days.

46.     On December 8, 2016, the Board determined to accept the Company C non-binding letter of intent, which did not have an exclusivity provision, and to continue negotiations with Company B.  However, prior to January 2017, Company C unilaterally decided to terminate its discussions with GigPeak.

47.     On December 14, 2016, the Company executed an updated non-binding indication of interest sent by Company B that valued the Company at $3.05 per share and was non-exclusive.  However, after initial due diligence, Company B informed GigPeak it was not interested in proceeding with an acquisition of the entirety of the Company.

48.     On January 6, 2017, IDT reached out to GigPeak to request a meeting to discuss a potential commercial collaboration.  Thereafter, on January 11, 2017, GigPeak and IDT entered into an NDA for the purpose of exploring some strategic business opportunity of mutual interest.

49.     On January 17, 2017, Gigpeak and IDT negotiated and executed the terms of an NDA for the purpose of discussing a potential acquisition of GigPeak.

50.     On January 25, 2017, IDT sent a non-binding letter of intent to acquire Gigpeak at an aggregate cost of $240 million subject to certain deductions.  GigPeak responded that it expected the valuation to be at or above $3.05 per share.

51.     On January 28, 2017, IDT sent a non-binding letter of intent to acquire GigPeak at $3.08 per share and a break-up fee of 4%, which was executed by GigPeak the same day.

52.     Throughout late January and early February of 2017 GigPeak and IDT negotiated the terms of the Proposed Acquisition.

53.     On February 7, 2017, members of IDT management met with GigPeak senior management to discuss continuing employment for certain GigPeak officers and terms thereof, however the 14D-9 provides no further information as to the discussions that took place.

54.     On February 11, 2017, the GigPeak Board met to discuss the IDT offer, at which point both Cowen and Needham rendered their respective fairness opinions.  The Board thereafter approved the merger agreement.

55.     On February 13, 2017, the Proposed Acquisition was executed by IDT and the Company and a joint press release was issued.

***The Proposed Acquisition***

56.     On February 13, 2017, IDT and GigPeak issued a joint press release announcing that GigPeak had agreed to be acquired by IDT in the Proposed Acquisition.  The press release states in relevant part:

> SAN JOSE, CALIFORNIA--(Marketwired - Feb 13, 2017) - Integrated Device Technology, Inc. (IDT®) (IDTI) and GigPeak, Inc. (NYSE MKT:GIG) today announced that they have signed a definitive agreement for IDT to acquire GigPeak, Inc., for total cash consideration of $3.08 per share, or approximately $250 million in cash. This per share consideration would represent a premium of approximately 22% to GigPeak's closing share price on February 10, 2017.

> The acquisition of GigPeak provides IDT with a highly regarded optical interconnect product and technology business that is complementary to IDT's leadership position in real-time interconnect products.

CLASS ACTION COMPLAINT

GigPeak's optical interface products are already broadly used by leading companies in the Communications, Cloud Data Center, and Military/Aviation markets. IDT will now provide seamless ultra-high speed data connectivity products using electrical, RF, and optical technologies.

"GigPeak is a recognized leader in high performance Optical, RF, and Video Transport technology, and is a perfect fit for IDT. The products, technology, and culture of GigPeak all complement and represent an acceleration of our current strategy," said Gregory Waters, IDT President & CEO. "We gain an exceptional group of talented people and valuable intellectual property with the GigPeak team, and welcome them into one of the most innovative companies in the semiconductor industry."

"IDT's acquisition of GigPeak will be a meaningful milestone for all of our stakeholders -- stockholders, employees, customers and partners," said Dr. Avi Katz, Founder, Chairman and CEO of GigPeak, Inc. "We find an exceptional culture, customers, business and technology compatibility with IDT, and we are delighted to join this fine team. Upon the consummation of this acquisition, our leading product suite, which currently addresses the need for greater bandwidth across the network, will now have the advantage of leveraging the scale of resources and broad distribution channels of IDT."

Offer Recommended by GigPeak Board of Directors

Under the terms of the merger agreement, IDT will commence a tender offer to acquire all of the issued and outstanding common stock of GigPeak for $3.08 per share. The implied fully-diluted equity value of the offer amounts to approximately $250 million.

The Boards of Directors of both GigPeak and IDT have unanimously approved the terms of the merger agreement, and the Board of Directors of GigPeak has resolved to recommend that stockholders accept the offer, once it is commenced.

The acquisition is structured as an all-cash tender offer for all outstanding issued common stock of GigPeak followed by a merger in which remaining shares of GigPeak would be converted into the same dollar per share consideration as in the tender offer. The transaction is not subject to a financing condition, and completion is anticipated during the second calendar quarter of 2017.

The transaction is subject to customary conditions, including the tender of the majority of the outstanding GigPeak shares and the expiration or earlier termination of the waiting period under the Hart-Scott-Rodino Antitrust Improvements Act of 1976. The transaction is expected to close during the second calendar quarter of 2017. GigPeak is expected to be delisted from the NYSE MKT and integrated into IDT thereafter.

Cowen and Company, LLC and Needham & Company, LLC acted as financial advisers and Crowell & Moring LLP acted as legal adviser to GigPeak. J.P. Morgan Securities LLC acted as exclusive financial adviser to IDT and provided financing commitment for the transaction, and Latham & Watkins LLP acted as legal adviser to IDT.

- 13 -

CLASS ACTION COMPLAINT

*The Inadequate Merger Consideration*

57.    Significantly, analyst expectations, the Company's strong market position, extraordinary growth, synergistic value to IDT, and positive future outlook, establish the inadequacy of the merger consideration.

58.    First and foremost, the compensation afforded under the Proposed Acquisition to company stockholder significantly undervalues the Company.  The proposed valuation of $3.08 per share is significantly less than the stock was trading at in February 2016, reaching a high of $3.26 per share.

59.    Additionally, all analyst coverage indicates targets above the deal price, ranging between $3.08 and $4.00 per share.

60.    Moreover, as set forth above, GigPeak's recent financial performance is indicative of a company on the rise with massive growth potential.  It bears repeating that reflecting on Fiscal 2016 after having robbed current stockholders of the ability to take part in the future growth of the Company, Defendant Katz stated that the Company was confident that after being bought by IDT, "we will be able to generate greater value for our customers, employees and stakeholders."

61.    The disparity of the deal was not lost on the analysts taking part in the IDT Conference Call on February 14, 2017, a call in which GigPeak management did not take part. During the conference call, IDT's CEO, Greg Waters noted that GigPeak's business "has already been growing – it has for some time."  This prompted the following question from Lena Zhang of Summit Redstone Partners LLC, "GigPeak at this point last year had a great growth story, great growth, and seems this year the growth will continue. Why they willing to sell at this point?" IDT management was unwilling to respond to the question – referring it to absent GigPeak management.

62.    In addition to simply undervaluing the Company, the Proposed Acquisition does not take into account the synergistic benefits that GigPeak will bring to IDT.  These values are touched upon explicitly in the merger press release, with Greg Waters, IDT CEO, stating "GigPeak is a recognized leader in high performance Optical, RF, and Video Transport technology, and is a perfect fit for IDT. The products, technology, and culture of GigPeak all complement and represent

CLASS ACTION COMPLAINT

an acceleration of our current strategy." "We gain an exceptional group of talented people and valuable intellectual property with the GigPeak team, and welcome them into one of the most innovative companies in the semiconductor industry."

63.    These synergistic benefits are also touched on in the afore-mentioned conference call by IDT's CFO, Brian White, who stated, "[w]e expect GigPeak to add approximately $16 million of revenue per quarter at approximately 70% non-GAAP gross margins. We expect the business to be accretive to earnings in the first full quarter following acquisition close and that it will support our target market of 30% non-GAAP operating market within three full quarters."

64.    It is clear from these statements and the facts set forth herein that this deal is designed to maximize benefits for IDT and IDT stockholders at the expense of GigPeak and GigPeak stockholders, which clearly indicates that GigPeak stockholders were not an overriding concern in the formation of the Proposed Acquisition.

**Potential Conflicts of Interest**

65.    In addition, the deal itself may have tainted by the self-interest of the Individual Defendants.  Certain insiders stand to receive financial benefits as a result of the Proposed Acquisition.  For example, many GigPeak officers and/or Directors currently hold large, illiquid blocks of Company stock.  Accordingly, upon the consummation of the Proposed Acquisition Company insiders including Directors and Officers will receive large paydays which would not normally occur, thus tainting their motivations in approving it.  Notably, certain company insiders own in aggregate approximately 1.4 million shares of Company stock, worth millions of dollars, as follows:

| Name | Number of Shares | Cash Consideration Payable in Respect of Shares | |
|---|---|---|---|
| **Executive Officers** | | | |
| Dr. Avi Katz | 319,996 | $ | 985,588 |
| Andrea Betti-Berutto | 70,676 | $ | 217,682 |
| Darren Ma | 70,956 | $ | 218,544 |
| Dr. Raluca Dinu | 124,557 | $ | 383,636 |
| | | | |
| **Non-Employee Directors** | | | |
| Neil J. Miotto | 187,839 | $ | 578,544 |
| Frank Schneider | 195,619 | $ | 602,507 |
| Kimberly D.C. Trapp | 101,001 | $ | 311,083 |
| John J. Mikulsky | 175,456 | $ | 540,404 |
| Joseph J. Lazzara | 172,322 | $ | 530,752 |

CLASS ACTION COMPLAINT

66.     Furthermore, according to the 14D-9, the Individual Defendants and other Company insiders collectively own tens of thousands of unvested Company options and/or RSUs that are worth millions of dollars.  If the Proposed Acquisition is consummated, the Individual Defendants will be able to immediately convert these otherwise large, illiquid blocks of Company stock into cash granting a benefit that will not be shared amongst the Plaintiff and other proposed Class Members.  The following table sets forth the number of Company options that are currently held by Company insiders, and which will be converted to cash upon the consummation of the Proposed Acquisition:

| Name | Number of Vested GigPeak Options | Cash Consideration Payable for Vested GigPeak Options | Number of Unvested GigPeak Options to be Accelerated | Cash Consideration Payable for Accelerated GigPeak Options | Total Consideration |
|---|---|---|---|---|---|
| **Executive Officers** | | | | | |
| **Dr. Avi Katz** | 2,995,229 | $ 2,933,091 | 0 | $ 0 | $ 2,933,091 |
| **Dr. Raluca Dinu** | 402,667 | $ 364,385 | 1,606 | $ 3,565 | $ 367,950 |
| **Andrea Betti-Berutto** | 1,097,178 | $ 1,220,268 | 0 | $ 0 | $ 1,220,268 |
| **Darren Ma** | 0 | $ 0 | 0 | $ 0 | $ 0 |
| **Non-Employee Directors** | | | | | |
| **Neil J. Miotto** | 216,100 | $ 198,423 | 0 | $ 0 | $ 198,423 |
| **Frank Schneider** | 167,500 | $ 68,575 | 0 | $ 0 | $ 68,575 |
| **Kimberly D.C. Trapp** | 192,526 | $ 182,816 | 0 | $ 0 | $ 182,816 |
| **John J. Mikulsky** | 65,000 | $ 26,700 | 0 | $ 0 | $ 26,700 |
| **Joseph J. Lazarra** | 65,000 | $ 26,700 | 0 | $ 0 | $ 26,700 |

67.     The following table sets forth the number of Company RSUs that are currently held by Company insiders, and which will be converted to cash upon consummation of the Proposed Acquisition:

| Name | Number of Unvested GigPeak RSUs Held | Cash Consideration Payable in Respect of Unvested GigPeak RSUs |
|---|---|---|
| **Executive Officers** | | |
| Dr. Avi Katz | 1,709,099 | $ 5,264,025 |
| Andrea Betti-Berutto | 122,192 | $ 376,351 |
| Darren Ma | 190,098 | $ 585,502 |
| Dr. Raluca Dinu | 542,161 | $ 1,669,856 |
| **Non-Employee Directors** | | |
| Neil J. Miotto | 82,634 | $ 254,513 |
| Frank Schneider | 78,234 | $ 240,961 |
| Kimberly D.C. Trapp | 77,962 | $ 240,123 |
| John J. Mikulsky | 79,962 | $ 246.283 |
| Joseph J. Lazzara | 77,962 | $ 240,123 |

CLASS ACTION COMPLAINT

68.     In addition, the following Company Officers have been granted lucrative employment contracts from IDT as part of the Proposed Acquisition.  This compensation is further evidence of the divide that exists in the Proposed Acquisition between Company insiders and the Plaintiff and other public stockholders, with several of the former being allowed to continue in the combined company's future success, while the latter are frozen out of any future benefits:

| Name | Annual Base Salary | One-Time Signing Bonus | Retention Bonus | Participation Rate In IDT's Annual Incentive Plan (AIP)[1] | Value of Restricted Share Units |
|---|---|---|---|---|---|
| Andrea Betti-Berutto | $ 269,954 | $ 300,000 | $ 96,337[2] | 40% | $ 750,000[3] |
| Darren Ma | $ 225,000 | $ 112,500 | $ 50,000[4] | 25% | — |
| Dr. Raluca Dinu | $ 341,250 | $ 450,000 | $ 389,173[5] | 50% | $ 1,200,000[6] |

69.     Moreover, certain employment agreements with several GigPeak officers or directors are entitled to severance packages should their employments be terminated under certain circumstances.  These 'golden parachute' packages are significant, and will grant each director or officer entitled to them at the very least, hundreds of thousands of dollars, compensation not shared by GigPeak common stockholders.  Of particular note, as displayed in the following table, is Defendant Katz' golden parachute provision, which ensures him ***over thirty-one million dollars in compensation*** as a direct result of the Proposed Acquisition:

| Name | Cash ($) | Equity ($) | Pension / NODC ($) | Perquisites / Benefits ($)[1] | Tax Reimbursement ($)[2] | Other ($) | Totals ($) |
|---|---|---|---|---|---|---|---|
| Dr. Avi S. Katz | $8,512,459[3] | $8,197,116[4] | — | $ 91,000 | $ 6,309,779 | $8,009,468[5] | $31,119,822 |
| Dr. Raluca Dinu | — | $2,037,806[6] | — | — | — | $1,424,596[7] | $ 3,462,402 |
| Andrea Betti-Berutto | — | $1,596,619[8] | — | — | — | $1,079,667[9] | $ 2,676,266 |
| Darren Ma | — | $ 585,502[10] | — | — | — | $ 404,879[11] | $ 990,381 |

70.     Thus, while the Proposed Acquisition is not in the best interests of GigPeak's stockholders, it will produce lucrative benefits for the Company's officers and directors.

***The Materially Misleading and/or Incomplete 14D-9***

71.     On March 7, 2017, GigPeak filed with the SEC a materially misleading and incomplete 14D-9 that failed to provide the Company's stockholders with material information and/or provides them with materially misleading information critical to the total mix of information available to the Company's stockholders concerning the financial and procedural fairness of the Proposed Acquisition.

CLASS ACTION COMPLAINT

*Omissions and/or Material Misrepresentations Concerning the Sales Process leading up to the Proposed Acquisition*

72.     Specifically, the 14D-9 fails to provide material information concerning the process conducted by the Company and the events leading up to the Proposed Acquisition.  In particular, the 14D-9 fails to disclose:

a.  The necessity to retain both Cowen and Needham and, thereby, causing the Company to pay an additional $1.5 million for services that were either unnecessary or not adequately explained.

b.  When IDT entered into discussions regarding management retention. This goes directly to whether members of management and the Board suffered any disabling conflict of interest due to their desire to retain their employment and secure lucrative post-transaction employment.  For example, as set forth above, the 14D-9 details the more that $31 million dollars Defendant Katz stands to receive as a result of the Proposed Acquisition.

*Omissions and/or Material Misrepresentations Concerning The Financial Analyses by Needham and Cowen*

73.     In the 14D-9, both Cowen and Needham describe their fairness opinions and the various valuation analyses performed to render such opinions.  However, both Cowen's and Needham's descriptions fail to include necessary underlying data, support for conclusions, or the existence of, or basis for, underlying assumptions.  Without this information, one cannot replicate the analyses, confirm the valuations or evaluate the fairness opinion.

74.     For example, the 14D-9 does not disclose material details concerning the analyses performed by Needham in connection with the Proposed Acquisition, including (among other things):

a.  *Selected Companies Analysis*:

With respect to Needham's Selected Companies Analysis, the 14D-9 fails to disclose:

CLASS ACTION COMPLAINT

        i.   The objective selection criteria and the observed company-by-company pricing multiples and financial metrics examined.

    b.  *Discounted Cash Flow Analysis*

With respect to Needham's *Discounted Cash Flow Analysis*, the 14D-9 fails to disclose:

        i.   The definition of unlevered free cash flow ("UFCF") used in the analysis.

    c.  *Selected Transactions Analysis*

With respect to Needham's *Selected Transactions Analysis*, the 14D-9 fails to disclose:

        i.   The objective selection criteria and the observed transaction by transaction multiples and metrics examined.

        ii.  The individual transaction values and dates for each of the selected transactions.

75.    Next, the 14D-9 does not disclose material details concerning the analyses performed by Cowen in connection with the Proposed Acquisition, including (among other things):

    a.  *Analysis of Selected Publicly Traded Companies*

With respect to Cowen's *Analysis of Selected Publicly Traded Companies*, the 14D-9 fails to disclose:

        i.   The objective selection criteria and the observed company-by-company pricing multiples and financial metrics examined.

    b.  *Discounted Cash Flow Analysis*

With respect to Cowen's *Discounted Cash Flow Analysis*, the 14D-9 fails to disclose:

        i.   The definition of unlevered free cash flow ("UFCF") used in the analysis.

CLASS ACTION COMPLAINT

    c.  *Analysis of Selected Transactions*

With respect to Cowen's *Analysis of Selected Transactions*, the 14D-9 fails to disclose:

    i.  The objective selection criteria and the observed transaction by transaction multiples and metrics examined.

    ii.  The individual transaction values for each of the selected transactions.

    iii.  Whether Cowen performed any benchmarking analysis for GigPeak in relation to the selected transactions.

76.    Without the omitted information identified above, GigPeak's public stockholders are missing critical information necessary to evaluate whether the proposed consideration truly maximizes stockholder value and serves their interests. Moreover, without the key financial information and related disclosures, GigPeak's public stockholders cannot gauge the reliability of the two fairness opinions and the Board's determination that the Proposed Acquisition is in their best interests.

**FIRST COUNT**

**Violations of Section 14(e) of the Exchange Act**

**(Against All Defendants)**

77.    Plaintiff repeats all previous allegations as if set forth in full herein.

78.    Defendants have disseminated the 14D-9 with the intention of soliciting stockholders to tender their shares in the Tender Offer.

79.    Section 14(e) of the Exchange Act provides that in the solicitation of shares in a tender offer, "[i] shall be unlawful for any person to make any untrue statement of a material fact or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they are made, not misleading[.]"

80.    The 14D-9 was prepared in violation of Section 14(e) because it is materially misleading in numerous respects and omits material facts, including those set forth above. Moreover, in the exercise of reasonable care, Defendants knew or should have known that the

**CLASS ACTION COMPLAINT**

14D-9 is materially misleading and omits material facts that are necessary to render them non-misleading.

81.    The Individual Defendants had actual knowledge or should have known of the misrepresentations and omissions of material facts set forth herein.

82.    The misrepresentations and omissions in the 14D-9 are material to Plaintiff and the Class, and Plaintiff and the Class will be deprived of their entitlement to decide whether to tender their shares on the basis of complete information if such misrepresentations and omissions are not corrected prior to expiration of the tender offer on April 3, 2017.

**SECOND COUNT**

**Violations of Section 20(a) of the Exchange Act**

**<u>(Against all Individual Defendants)</u>**

83.    Plaintiff repeats all previous allegations as if set forth in full herein.

84.    The Individual Defendants were privy to non-public information concerning the Company and its business and operations via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and Board meetings and committees thereof and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Individual Defendants knew or should have known that the 14D-9 was materially misleading to Company stockholders.

85.    The Individual Defendants were involved in drafting, producing, reviewing and/or disseminating the materially false and misleading statements complained of herein. The Individual Defendants were aware or should have been aware that materially false and misleading statements were being issued by the Company in the 14D-9 and nevertheless approved, ratified and/or failed to correct those statements, in violation of federal securities laws. The Individual Defendants were able to, and did, control the contents of the 14D-9. The Individual Defendants were provided with

copies of, reviewed and approved, and/or signed the 14D-9 before its issuance and had the ability or opportunity to prevent its issuance or to cause it to be corrected.

86.    The Individual Defendants also were able to, and did, directly or indirectly, control the conduct of GigPeak's business, the information contained in its filings with the SEC, and its public statements. Because of their positions and access to material non-public information available to them but not the public, the Individual Defendants knew or should have known that the misrepresentations specified herein had not been properly disclosed to and were being concealed from the Company's stockholders and that the 14D-9 was misleading. As a result, the Individual Defendants are responsible for the accuracy of the 14D-9 and are therefore responsible and liable for the misrepresentations contained herein.

87.    The Individual Defendants acted as controlling persons of GigPeak within the meaning of Section 20(a) of the Exchange Act. By reason of their position with the Company, the Individual Defendants had the power and authority to cause GigPeak to engage in the wrongful conduct complained of herein. The Individual Defendants controlled GigPeak and all of its employees. As alleged above, GigPeak is a primary violator of Section 14 of the Exchange Act and SEC Rule 14d-9.  By reason of their conduct, the Individual Defendants are liable pursuant to section 20(a) of the Exchange Act.

WHEREFORE, Plaintiff demands injunctive relief, in his favor and in favor of the Class, and against the Defendants, as follows:

A.    Ordering that this action may be maintained as a class action and certifying Plaintiff as the Class representative and Plaintiff's counsel as Class counsel;

B.    Enjoining the Proposed Acquisition;

C.    In the event defendants consummate the Tender Offer, rescinding it and setting it aside or awarding rescissory damages to Plaintiff and the Class;

D.    Directing defendants to account to Plaintiff and the Class for their damages sustained because of the wrongs complained of herein;

E.     Awarding Plaintiff the costs of this action, including reasonable allowance for Plaintiff's attorneys' and experts' fees; and

F.     Granting such other and further relief as this Court may deem just and proper.

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands a jury on all issues which can be heard by a jury.

Dated: March 16, 2017

BRODSKY & SMITH, LLC

By: _____
Evan J. Smith (SBN242352)
9595 Wilshire Boulevard, Suite 900
Beverly Hills, CA 90212
Telephone:    (877) 534-2590
Facsimile:    (310) 247-0160

*Attorneys for Plaintiff*

- 23 -

CLASS ACTION COMPLAINT